UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

SYNECTIC ASSET MANAGEMENT INC.,                Bankr. Case No. 8:09-bk-5172 CED
                                                Apv. Pro. 8:13-ap-469-CED
           Debtor,
_____/

LANGDALE CAPITAL ASSETS, INC., a
Georgia for profit corporation; JLD             Case No. 8:14-cv-2762-T-24
PROPERTIES, LLC a Georgia limited
liability company; FERRELL SCRUGGS, Jr.,
an individual; and PATRICK ROBINSON,
an individual,

           Appellants,
v.

SUSAN WOODARD, as Chapter 7 Trustee
of the Bankruptcy Estate of Synectic Asset
Management Inc., SYNECTIC VENTURES I,
LLC, SYNECTIC VENTURES II, LLC and
SYNECTIC VENTURES III, LLC,

           Appellees.
_____/

# ORDER

This cause comes before the Court on Appellants' Emergency Motion for Stay Pending Appeal. (Doc. No. 1). The Court held a hearing on the motion on November 12, 2014. As explained below, the motion is denied.

**I.  Bankruptcy Court's Order Being Appealed**

On September 29, 2014, the bankruptcy court granted Appellees' motions for summary judgment and denied Appellants' motions for summary judgment. (Doc. No. 1-4). The facts of

this case are thoroughly described in the bankruptcy court's well-written order, but a summary of the relevant facts follows.

### Berkman's First Fraudulent Scheme

The debtor, Craig Berkman, ran an elaborate Ponzi scheme, which included the use of various companies, including Synectic Ventures I, LLC, Synectic Ventures II, LLC, and Synectic Ventures III, LLC (collectively, "Synectic Funds"). Berkman conducted business through a management company, Synectic Asset Management Company, Inc. ("SAM").

In 2005, the Synectic Funds filed a lawsuit against Berkman in Oregon state court, and thereafter, Berkman transferred title to certain assets to himself and his wife as tenants by the entirety. Those assets included a home that cost almost $4 million, over 600,000 shares of stock in EVI Corporation, and nearly all of the money in his bank accounts.

In 2008, judgment was entered against Berkman and SAM in the Oregon state court, jointly and severally, in favor of the Synectic Funds for compensatory damages of $15 million, plus punitive damages against Berkman for $10 million and punitive damages against SAM for $4.7 million. Despite these judgments, Berkman continued to conduct business that he managed through SAM.

### Bankruptcy Proceedings and Global Settlement of Claims

In 2009, the Synectic Funds filed involuntary bankruptcy petitions against Berkman and SAM. Susan Woodward was appointed as the Chapter 7 Trustee for both bankruptcy cases. In the Berkman bankruptcy case, the Trustee filed objections to Berkman's claimed exemptions for tenancy by the entireties properties consisting of the home, EVI stock, and the money in the bank accounts. The Trustee also filed an adversary proceeding to avoid and recover the transfers of

those assets. The Synectic Funds commenced two adversary proceedings against Berkman—one objecting to his bankruptcy discharge and one to except their claim from discharge. In the SAM bankruptcy case, the Trustee filed three adversary proceedings against Berkman and related entities, including proceedings to avoid transfers of $295,000 and $50,000.

Thereafter, the Trustee and Synectic Funds on one side and Berkman and SAM on the other side negotiated a settlement of all of the issues between them (the "Global Settlement Agreement" or "GSA"). The GSA required Berkman to pay a total of $4.75 million to the Trustee (in installments) in exchange for the Trustee's abatement, and eventual dismissal, of the pending litigation against Berkman and SAM and the Trustee's sale of other estate assets back to Berkman. The settlement funds were to be divided equally between the Berkman and SAM bankruptcy cases. The Synectic Funds, in consideration of the receipt of their share of the Trustee's distributions to unsecured creditors (which would include Berkman's $4.75 million settlement payment), agreed to dismiss their adversary proceedings so that the balance of the debt owed to them by Berkman would be discharged. The Synectic Funds also agreed to pay $97,270 and transfer shares of stock in an unrelated company, Well Partner, to one of Berkman's companies.

Section 4.2 of the GSA provides that if Berkman defaulted on the settlement payments or failed to satisfy the requirements of Section 4.5, the GSA would be terminated and of no further effect. Section 4.5 of the GSA provides the following:

> ***In connection with seeking approval of [the GSA]***, Mr. Berkman's counsel will (i) certify that (a) the source of the Settlement Funds is compensation paid or to be paid to Mr. Berkman and is not from an investment fund which is managed for the benefit of third parties, and (b) the funding source has been given notice of the settlement approval objection/hearing process at least five business days in

>    advance of the date of the hearing by the Bankruptcy Court, (ii) provide proof of such notice to the Bankruptcy Court confidentially and under seal, without access to such notice by the Trustee, and Petitioning Creditors [the Synectic Funds] or any other creditors, and (iii) seek and obtain a finding from the Bankruptcy Court that Mr. Berkman's fund-raising transaction that is the source of the Settlement Funds is a good faith transaction arising postpetition.

(SAM Bankr. Doc. No. 61-1 )(emphasis added).

The Trustee filed a motion with the bankruptcy court to approve the GSA. Additionally, pursuant to Section 4.5 of the GSA, Berkman's attorney submitted documentation under seal that the source of funds to be used to make the settlement payments were from Berkman's earnings from a company, Ventures Trust Management, LLC ("VTM"), in which Berkman had no ownership interest and that the funds used to pay Berkman were not derived from investors in VTM projects or from projects or funds that are managed by VTM for the benefit of third parties.

On May 27, 2011, the bankruptcy court approved the GSA and found that Berkman was making the settlement payments from compensation to be paid to him from a post-petition good faith transaction.[1] Berkman paid $1.5 million prior to the bankruptcy court's approval of the GSA and Berkman's attorney's certification of the funding, and Berkman continued making all of the payments thereafter. Once Berkman paid the entire $4.75 million, the Trustee allocated the settlement funds between the Berkman and SAM bankruptcy estates. In return, the Trustee

---

[1] By the time that the bankruptcy court approved the GSA, Berkman had already paid $1.5 million due under the GSA. (SAM Bankr. Doc. No. 87). However, because Berkman had failed to pay additional amounts due, the Court declared Berkman to be in default of the GSA in the same order that the bankruptcy court approved the GSA. (SAM Bankr. Doc. No. 87). The GSA was later reinstated on August 30, 2011, and Berkman was again found to be in default after paying an additional $100,000. (SAM Bankr. Doc. No. 93-1, 99). Thereafter, on May 18, 2012, the GSA was again reinstated and the GSA was fully paid the remaining amount due thereunder. (Doc. No. 141).

withdrew her objections to Berkman's claimed exemptions in the Berkman bankruptcy case, the Trustee gave Berkman a bill of sale that conveyed all of the Trustee's rights title, and interest in all of the scheduled assets in the Berkman and SAM bankruptcy cases, the Synectic Funds obtained an order vacating the bankruptcy order that had declared their underlying $25 million judgment against Berkman to be non-dischargeable, the Synectic Funds moved to vacate their underlying Oregon (and domesticated Florida) judgments against Berkman and SAM, and the Synectic Funds paid $97,270 and transferred 13,000 shares of Well Partner stock to one of Berkman's companies.

On December 15, 2012, the Trustee distributed the funds in Berkman's bankruptcy estate (totaling approximately $2.1 million) to his creditors, which included Alco Holdings, LLC ("Alco") and the Synectic Funds. On March 8, 2013, the Trustee filed her amended Final Report in the SAM bankruptcy, in which she indicated that there was approximately $2.4 million in funds available for distribution to creditors. The SAM bankruptcy funds have not yet been distributed.

### **Berkman's Second Fraudulent Scheme and Effect on Bankruptcy Proceedings**

Thereafter, Berkman was charged with securities and wire fraud in New York federal court relating to entities controlled by Berkman between December 2010 and March 2013 that had fraudulently obtained over $13 million from 120 investors. Berkman pled guilty and is now incarcerated. As a result of the criminal charges, the Trustee filed an adversary proceeding in Berkman's bankruptcy case to revoke the discharge, which the bankruptcy court granted.

On April 19, 2013, Langdale Capital Assets, Inc., JLD Properties, LLC, Ferrell Scruggs, Jr., and Patrick Robinson (collectively, "Langdale Plaintiffs") commenced an adversary

proceeding in the Berkman bankruptcy case seeking to avoid the transfers from Berkman to the Trustee, and the subsequent transfers from the Trustee to the Synectic Funds and Alco, as fraudulent transfers under Florida's Uniform Fraudulent Transfers Act ("FUFTA"), specifically Fla. Stat. §§ 726.105(1)(a), 726.105(1)(b), and 726.106(1) (the "Berkman Adversary").  In their amended complaint, in addition to the fraudulent transfer claims, the Langdale Plaintiffs also asserted claims for unjust enrichment and money had and received.

The Langdale Plaintiffs alleged that they are victims of Berkman's most recent fraudulent scheme, having wired funds totaling $1.8 million into one or more accounts that Berkman controlled.  They further alleged that Berkman used all or a substantial part of those funds to make the settlement payments under the GSA to the Trustee.

Thereafter, 33 more victims of Berkman's second fraudulent scheme (collectively referred to as the "Investment Group" and, together with the Langdale Plaintiffs, "Plaintiffs") intervened in the Berkman Adversary and filed a third-party complaint.  The Investment Group alleged that from November 2010 through May 2012, its 33 individual members invested a total of $5,185,088 with Berkman by wiring funds into one or more accounts that he controlled. The Investment Group asserted the same causes of action as the Langdale Plaintiffs.

In the SAM bankruptcy case, the Langdale Plaintiffs filed an emergency motion to vacate the Trustee's court-approved Final Report.  The Trustee, who had not yet made distributions to creditors in the SAM bankruptcy case, filed a complaint against the Langdale Plaintiffs for declaratory and injunctive relief, seeking a judicial determination that the Langdale Plaintiffs have no rights to the property in the Trustee's possession and that the Trustee is authorized to make distributions to creditors (the "SAM Adversary").  The Langdale Plaintiffs answered and

counterclaimed on the same grounds that they alleged in their amended complaint in the Berkman Adversary. The Investment Group sought and obtained leave to intervene in the SAM Adversary as defendants and counter-plaintiffs.

## Summary Judgment Motions at Issue in the Appeal

The summary judgment order at issue deals with both the Berkman Adversary and SAM Adversary, as the issues in both adversary cases are identical. However, Appellants (the Langdale Plaintiffs and the Investment Group) are only appealing, in this case, the summary judgment order as it relates to the SAM adversary. The Appellants have filed another case appealing the summary judgment order as it relates to the Berkman Adversary.[2]

In the bankruptcy court's summary judgment order, the Court granted Appellees (the Trustee and Synectic Funds) summary judgment on Appellants' FUFTA claims. Appellants' FUFTA claims are: (1) that Berkman transferred the settlement payments with the actual intent to hinder, delay, or defraud creditors; (2) that Berkman transferred the settlement payments without receiving a reasonably equivalent value in exchange for the transfer while Berkman (I) was engaged or about to engage in a transaction for which his remaining assets were unreasonably small in relation to the transaction or business, or (ii) intended to incur, or believed or reasonably believed that he would incur, debts beyond his ability to pay; and (3) that Berkman made the transfer without receiving reasonably equivalent value and either was insolvent at the time of the transfer or became insolvent as a result of the transfer. With respect to the first FUFTA claim—that Berkman transferred the settlement payments with the actual intent to hinder, delay, or defraud creditors—the Trustee asserted the affirmative defense that she accepted the settlement

---

[2]Case No. 8:14-cv-2802-T-27.

payments in good faith and for a reasonably equivalent value.  Therefore, in order for Appellants to succeed on their FUFTA claims, the bankruptcy court had to find that the Trustee took the settlement payments for less than reasonably equivalent value.

The bankruptcy court concluded that the evidence established that the Trustee did not take the settlement payments for less than reasonably equivalent value.  The bankruptcy court found that Berkman's payment of the $4.75 million in settlement funds to the Trustee was on account of an antecedent debt; i.e., his liability to the Trustee on her claims against him in the adversary proceedings.  Furthermore, the bankruptcy court found that the Synectic Funds and Alco received their distributions from the Trustee in the Berkman bankruptcy case on account of Berkman's antecedent debts to them.

The bankruptcy court also rejected Appellants' argument that the GSA is void due to Sections 4.2 and 4.5, and as a result, the Synectic Funds' judgment could be revived and the Trustee could pursue her rights against Berkman.  Appellants argued that because Berkman lied about the source of the funds used for the GSA's settlement payments, the GSA is now void.  However, the bankruptcy court pointed out that Appellants misread Section 4.5 of the GSA, which simply requires that Berkman's attorney certify to the bankruptcy court (and obtain a finding from the bankruptcy court) that the source of the settlement funds that Berkman paid under the GSA is from a good faith transaction arising post-petition.  Berkman's counsel complied with Section 4.5, and as a result, the GSA is not void pursuant to Section 4.2.

Additionally, the bankruptcy court concluded that the Trustee objectively acted in good faith because there was no evidence that she had actual knowledge of the Berkman's fraudulent purpose or knowledge of such facts or circumstances that would have caused an ordinarily

prudent person to make further inquiry, which would have disclosed Berkman's fraudulent purpose. Because the bankruptcy court found that the Trustee did not take the settlement payments for less than reasonably equivalent value and that the Trustee acted in good faith, the bankruptcy court granted summary judgment in favor of Appellees on Appellants' FUFTA claims.

Likewise, the bankruptcy court granted summary judgment in favor of Appellees on Appellants' unjust enrichment claim, because the Trustee provided reasonably equivalent value to Berkman in exchange for the settlement funds. Furthermore, the bankruptcy court noted that the unjust enrichment claim failed for an additional reason—there was nothing inequitable in allowing the Trustee (and those to whom the Trustee had made distributions) to retain the settlement payments, because the Trustee acquired the settlement payments in a lawful manner.

The bankruptcy court also court granted summary judgment in favor of Appellees on Appellants' claim for money had and received. The bankruptcy court stated that this claim required Appellants to show that the Trustee received Appellants' money as a result of Berkman's fraud and that the circumstances are such that the Trustee should, in all fairness, be required to return the money to Appellants. Stated differently, Appellants were required to show that an injustice would occur if the money was not refunded. However, the bankruptcy court stated that the injustice must arise from Appellees' own actions. Having found that the Trustee did nothing improper, the bankruptcy court granted summary judgment in favor of Appellees on this claim.

Finally, the bankruptcy court granted summary judgment in favor of Appellees on Appellants' claim for injunctive relief. Appellants asked the bankruptcy court to enjoin the Trustee from concluding her administration of the SAM bankruptcy estate and distributing the

funds to the estate's creditors. The bankruptcy court denied the relief, given that Appellants had failed to show a likelihood of success on the merits of their other claims.

## II. Notice of Appeal and Request for a Stay

Appellants now appeal the bankruptcy court's summary judgment order as it relates to the SAM bankruptcy case. Additionally they seek a stay of the bankruptcy court's order denying them injunctive relief in the form of enjoining the distribution of funds to the creditors of the SAM bankruptcy estate pending this appeal.

Appellants first sought a stay pending appeal from the bankruptcy court, which denied their motion. As a result, Appellants filed the instant motion to stay in this Court.

## III. Motion to Stay Pending Appeal

In order to obtain a stay pending appeal, the following standard applies:

> The movant must clearly establish: (i) that the movant is likely to prevail on the merits of its appeal, (ii) that the movant will suffer irreparable injury if a stay or other injunctive relief is not granted, (iii) that other parties will suffer no substantial harm if a stay or other injunctive relief is granted, and (iv) in circumstances where the public interest is implicated, that the issuance of a stay or other injunctive relief will serve, rather than disserve, such public interest.

In re F.G. Metals, Inc., 390 B.R. 467, 471-72 (M.D. Fla. 2008)(citations omitted). Furthermore, "[t]he moving party's likelihood of prevailing on the merits of its appeal is generally the most important of the four criteria identified above, and the Court must ordinarily find that the appealed decision was clearly erroneous." Id. at 472 (citation omitted). However, "the movant may also have his motion granted upon a lesser showing of a "substantial case on the merits" when the balance of the equities [identified in factors 2, 3, and 4 above] weighs heavily in favor of granting the stay." Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986)(quotation

marks and citation omitted).

**<u>Likelihood of Success</u>**

Appellants fail to show that a stay pending appeal should be granted. Based on the record before this Court and the oral argument on this motion, Appellants fail to show that the bankruptcy court erred such that they will likely succeed on the merits of this appeal.

Appellants make three arguments in support of their contention that the bankruptcy court erred: (1) because it is undisputed that the funds stolen from Appellants were used to pay the GSA,[3] equity requires that this Court undo the GSA as it relates to the SAM bankruptcy estate and put the parties back in the position that they were in before the stolen money was used to fund the GSA; (2) the Trustee and the Synectic Funds did not give reasonably equivalent value in exchange for the $4.75 million paid under the GSA; and (3) the Trustee's conduct, in failing to seek certification regarding the final $3.15 million payment after the approval of the GSA, led to the payment of the GSA with stolen funds. As explained below, the Court rejects these arguments.

First, Appellants argue that the bankruptcy court erred because it is undisputed that the funds stolen from Appellants were used to pay the GSA. As such, Appellants contend that equity requires that this Court undo the GSA as it relates to the SAM bankruptcy estate and put the parties back in the position that they were in before the stolen money was used to fund the GSA. The flaw in this argument is two-fold: First, as explained later in this Order, the Trustee gave reasonably equivalent value in exchange for the $4.75 million settlement payment, and as such, equity does not require this Court to undo the GSA.

Second, it is not clear to this Court that it would be able to return the parties back to their

---

[3]At the hearing, the Synectic Funds stated that no one disputes that the final $3.15 million payment made under the GSA was done using Appellants' stolen funds.

original positions. Appellants have not shown that the bankruptcy court or this Court has the power to reinstate judgments that were entered and vacated in Florida and Oregon state courts. Furthermore, even if this Court could reinstate the Trustee's liens on Berkman's property, Appellants have not shown that the Trustee would necessarily be able to be returned to the priority positions that her liens previously held.

Next, Appellants argue that the bankruptcy court erred because the Trustee and the Synectic Funds did not give reasonably equivalent value in exchange for the $4.75 million paid under the GSA. Appellants, however, have not shown this contention to be correct. Among other things, the Trustee withdrew her objections to the exemptions that Berkman claimed in his bankruptcy case, the Synectic Funds had the bankruptcy court vacate its order that their $25 million judgment was non-dischargeable, and the Synectic Funds vacated their Oregon and Florida judgments against Berkman and SAM. While Appellants contend that these actions were essentially worthless because there were no assets to satisfy these claims, the Court cannot conclude that Appellants' assessment is correct. It is undisputed that Berkman is a sophisticated fraudster who wrongfully obtained millions of dollars. While no one can currently find any other assets that he owns, this Court cannot conclude that Berkman is in fact judgment-proof, such that any claims against him that were given up via the GSA were essentially worthless. He may have assets that are well-hidden, which could make the $25 million judgment against him a valuable concession.

Furthermore, reasonably equivalent value does not require a dollar-for-dollar transaction. See In re Southmark Corp., 138 B.R. 820, 829 (Bankr. N.D. Tx. 1992)(citation omitted). In determining whether reasonably equivalent value was given, courts employ a two-step analysis:[4]

---

[4]This Court is aware that the following approach comes from a case analyzing "reasonably equivalent value" under the bankruptcy code. However, Appellants argued at the

> First, the court must determine whether [Berkman] received any value at all in exchange for the transfer. The inquiry in the first step of the analysis is whether [Berkman] obtained "any benefit . . . whether direct or indirect" . . . . Second, if it is determined that "value" was in fact conferred on [Berkman] as a result of the transaction, the court must then determine whether that value was reasonably equivalent to the cash transferred by [Berkman]. In making this assessment, the court may apply a "totality of the circumstances" test. The totality of the circumstances test includes the consideration of a variety of factors, such as the fair market value of the item or service received compared to the price paid, the arms-length nature of the transaction, and the good faith of the transferee.

In re Tower Environmental, Inc., 260 B.R. 213, 225 (Bankr. M.D. Fla. 1998)(citation omitted).

It is undisputed that Berkman did, in fact, obtain value from the transfer. Instead, Appellants dispute whether that value was reasonably equivalent to the $4.75 million transferred by Berkman. The Court concludes that at this early stage of the appeal, Appellants have not shown that the bankruptcy court erred in finding that Berkman received a reasonably equivalent value under the GSA. See In re Southmark Corp., 138 B.R. at 829, 830 (finding that the release of a judgment against the debtor for $22 million was reasonably equivalent value given in exchange for the payment of $16.5 million; the underlying debtor argued against this conclusion and contended that the $22 million judgment was only worth $2.2 million under the debtor's confirmed plan of reorganization).

Next, Appellants argue that the bankruptcy court erred because it was the Trustee's own conduct, in failing to seek certification regarding the final $3.15 million payment after the approval of the GSA, that led to the payment of the GSA with stolen funds. At the hearing before this Court, Appellants appeared to argue that Berkman's attorney was required to re-certify that the funds used to pay the $3.15 million balance due under the GSA were from a legitimate source. Therefore, Appellants attribute this failure to the Trustee and argue that such certification could

---

hearing before this Court that this was the appropriate test.

n/a

have prevented their stolen funds from being used to make the final payment under the GSA. However, Section 4.5 of the GSA only required that "*[i]n connection with seeking approval of [the GSA]*, Mr. Berkman's counsel will" make such a certification and obtain the bankruptcy court's finding regarding the legitimacy of the funds. (SAM Bankr. Doc. No. 61-1 )(emphasis added). When the GSA was initially approved, such certification was made and the bankruptcy court's finding regarding the legitimacy of the funds was made. No further certification was required under the GSA.

Furthermore, the bankruptcy court found that the representative of the Langdale Plaintiffs, attorney William Langdale, was told by Berkman in an in-person meeting about his prior litigation with the Synectic Funds. However, the bankruptcy court found that Berkman failed to investigate into the matter further. As a result, the bankruptcy court concluded that as between the Appellees and Appellants, equity favors the Appellees who had no knowledge that Berkman was a fraudster, whereas an investigation into Berkman by Appellants would have revealed his fraudulent background.

Accordingly, for the reasons stated above, the Court concludes that Appellants have failed to show a likelihood of success on the merits of their appeal.

## Remaining Factors

Given that Appellants have not shown that there is a likelihood that they will succeed on the merits of this appeal, the Court need not consider the remaining factors. However, the Court will consider the remaining factors, which show that a stay pending appeal is not warranted.

Appellants have failed to show that they will suffer irreparable injury if a stay is not granted. Appellants are seeking to enjoin the Trustee from distributing funds to the creditors of the SAM bankruptcy estate pending this appeal. Thus, if the stay is denied, the only injury that

may occur is that the Trustee will distribute funds that Appellants contend belong to them; money damages will cure such an injury. Furthermore, to the extent that Appellants claim that they will be irreparably harmed by the fact that their efforts to appeal will be effectively impaired by the distribution of the funds, such an implicit mooting of their appeal does not constitute irreparable harm. See In re Charter Co., 72 B.R. 70, 72 (Bankr. M.D. Fla, 1987)(stating that the fact that denial of the requested stay may render the appeal moot is not sufficient to establish irreparable harm). Furthermore, the Court notes that Appellants are appealing the summary judgment order in the Berkman bankruptcy case despite the fact that their stolen funds have already been distributed to the estate's creditors.

With regard to the third and fourth factors, Appellants have not shown that Appellees and the creditors of the SAM bankruptcy estate will not suffer substantial harm if a stay is granted. Instead, granting the stay would unduly delay the administration of the SAM bankruptcy estate and the creditors of the estate will be harmed by the unnecessary delay. See In re Bob Hamilton Real Estate, Inc., 164 B.R. 703, 705 (Bankr. M.D. Fla. 1994).

Accordingly, the Court concludes that a stay pending appeal is not warranted. Therefore, the Court denies Appellants' motion for a stay pending appeal.

## IV. Alternative Request for a Bond

Alternatively, Appellants request that this Court require the Trustee to post a bond in an amount at least equal to the amount of the GSA settlement funds allocated to the SAM bankruptcy estate. Appellants contend that this is the only way to safeguard their rights if this appeal is successful.

Appellees respond that the purpose of posting a bond during an appeal is to protect the prevailing party in the underlying proceeding against any loss that might result from the stay.

Given that Appellants were not the prevailing party in the underlying bankruptcy proceedings, Appellees argue that there is no basis for requiring Appellees to post a bond for this appeal. This Court agrees and denies Appellants' request that the Trustee be required to post a bond.

**DONE AND ORDERED** at Tampa, Florida, this 12th day of November, 2014.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record